# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

REGINALD HOLMES,

                                    Plaintiff,

        v.

DARWIN LECLAIR,[1] Supt., Franklin                  9:09-CV-0437
Correctional Facility; JHONNY WHITE, C.O.,         (TJM/ATB)
Franklin Correctional Facility; PETER
GRAY, C.O., Franklin Correctional Facility;
JOHN DOE, Male Nurse; SGT. HAMMOND;[2]
BEASHARD,[3] C.O.; REARDON, C.O.,

                                   Defendants.

REGINALD HOLMES, Plaintiff, *pro se*
AARON M. BALDWIN, AAG, for the Defendants

ANDREW T. BAXTER, U.S. MAGISTRATE JUDGE

## REPORT and RECOMMENDATION

This matter was referred for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable Thomas J. McAvoy, Senior United States District Judge.

In his amended complaint, plaintiff alleges that defendants have retaliated against plaintiff by harassing him and by filing false misbehavior reports at the behest of defendant White because plaintiff was a witness for another inmate against

---

[1] This defendant's name is spelled "LaClair," and the court will refer to defendant with the proper spelling of his name.

[2] Plaintiff often spells this defendant's name "Hamond," however, his name is actually spelled "Hammond," and the court will refer to him with the proper spelling of his name.

[3] This officer's name is spelled "Brassard," and the court will refer to this defendant with the proper spelling of his name.

defendant White and because plaintiff later filed grievances against defendant White. (AC; Dkt. No. 19). Plaintiff also claims that he was assaulted by defendants Hammond, Brassard, and Reardon on July 1, 2008; his "religious rights" were violated during a strip search; and he was transferred to Upstate Special Housing Unit ("SHU") "as further punishment." (AC ¶¶ 11-12, 14). Plaintiff states that the "nurse failed to report my complaints and injuries that were obviously [shown] on my body." (AC ¶ 13). Plaintiff seeks substantial monetary relief and unspecified injunctive relief. (AC ¶ 25).

Presently before the court is plaintiff's motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 71). Defendants oppose plaintiff's motion and have cross-moved for summary judgment. (Dkt. No. 74). Plaintiff asked for, and was granted, an extension of time within which to respond to defendants' motion. (Dkt. No. 77 & Text Order dated July 16, 2012). My order gave plaintiff until August 31, 2012 within which to file his response, and afforded defendants until September 14, 2012 to file any reply. (Text Order dated July 16, 2012). Plaintiff did not file a response, and by letter dated September 13, 2012, defendants state that due to plaintiff's failure to file a response by the court-ordered deadline, defendants would not be filing a formal reply. (Dkt. No. 78). Thus the summary judgment motions are fully submitted, and ready for decision.

## DISCUSSION

## I.   <u>FACTS</u>

### A.   **Plaintiff's Allegations**

Plaintiff first alleges in his amended complaint that he and Inmate Pryor were issued false misbehavior reports on June 2, 2008[4] because they "testfied," against defendant White, on behalf of Inmate Duckett, who was allegedly assaulted by defendant White.[5] (AC ¶ 3).  Plaintiff then claims the abuse "seemed to clearly start" and that he became the "target" of White's harassment when defendant White "found out" that plaintiff had a pending law suit against the New York Police Department ("NYPD") for "abuse" and "violations" that plaintiff suffered at the hands of the NYPD in Brooklyn.[6] (AC ¶ 4).

Plaintiff states that defendant White's first act of retaliation was "fabricating" a misbehavior report against Inmate Pryor because Pryor filed a grievance against White in June, and plaintiff was a witness for Inmate Pryor's grievance. (AC ¶ 5).  Plaintiff claims that the harassment was mostly verbal, including threats to "set plaintiff up" for being a witness against White. (AC ¶ 5).  Plaintiff states that he began to feel

---

[4] Plaintiff's misbehavior report was written by Officer Barse, who is not a defendant, but who plaintiff claims maintained a "close" relationship with defendant White. (AC ¶ 3).

[5] Plaintiff does not specify at what kind of a proceeding he and Inmate Pryor testified, although later in the amended complaint, he states that he was a witness for two different inmates who filed grievances against defendant White.  Thus, the court assumes that plaintiff testified at a grievance hearing.

[6] Plaintiff claims that defendant White discovered plaintiff's lawsuit because defendant White was often instructed to send plaintiff to the "hospital" to participate in telephone conferences regarding his case. (AC ¶ 4).

"uncomfortable" in his housing unit, and he states he filed a grievance against defendant White on June 21, 2008. (AC ¶ 5).  On the same date, defendant White filed a false misbehavior report against plaintiff. (AC ¶¶ 5-6).  Plaintiff states that on June 28, 2008, he wrote a letter to the Superintendent, defendant LaClair. (*Id.*)  On July 1, 2008, plaintiff claims that Officer Peter Gray, "defendant White's co-worker," wrote a false misbehavior report against plaintiff. (AC ¶ 6).  Plaintiff claims that he was the subject of four allegedly false misbehavior reports within a thirty-day period. (*Id.*)

Plaintiff alleges that his "entire defense during the Disciplinary Hearing," resulting from the June 21st misbehavior report, was that he was innocent of the charges, and that defendant White and the other officers were retaliating against plaintiff for his testimony on behalf of inmates who filed grievances against defendant White. (AC ¶ 7).  Plaintiff states that defendant Superintendent LaClair "neglected his duties as an overseer of his employees" and ignored prisoners' complaints about his officers. (AC ¶ 8).

Plaintiff claims that defendant LaClair did not respond to plaintiff's June 28th letter, but that on June 29 or 30, 2008, plaintiff was called to the school building and questioned in a "nasty and abusive" manner by defendant Hammond, who was "[supposedly]" investigating the grievance.[7] (AC ¶ 9).  Plaintiff states that defendant Hammond "threatened" plaintiff by telling him that he would be "locked up" if any of plaintiff's witnesses reported anything "different" concerning plaintiff's allegations.

---

[7] The court assumes that plaintiff is referring to the June 21st grievance because that is the only grievance he had written by that time.

(*Id.*)  Plaintiff claims that defendant Hammond interviewed all the witnesses in a "threatening fashion," causing them all to refuse to testify for plaintiff. (*Id.*)

On July 1, 2008, plaintiff claims that defendant Hammond came into plaintiff's dormitory and "roughly dragged" plaintiff out of his cube.[8] (AC ¶ 10).  Plaintiff claims that his arm was twisted behind his back, and he was snatched by the back of his neck by defendants Hammond, Brassard, and Reardon, who then dragged plaintiff out of the dormitory in "a humiliating manner." (*Id.*)  Plaintiff claims that these officers then pushed his face against a wall and punched him in the ribs and back.  Sergeant Hammond squeezed plaintiff's face with both hands, "threateningly" asked plaintiff if he wanted to "do anything" before they put the handcuffs on him, and then smacked him in the back of the head. (AC ¶ 11).  Plaintiff was then placed in a van and driven to the Special Housing Unit ("SHU").  When they arrived at the SHU, plaintiff claims that he was snatched by the throat by defendant Brassard, who then threw plaintiff against the wall, pushing on his ribs. (*Id.*)

Finally, plaintiff claims that he was "sexually humiliated" during the strip search upon his admission to SHU. (AC ¶ 12).  In addition, plaintiff claims that defendant Reardon hit him in the back of the head while plaintiff was naked.  Plaintiff states that his "religious beliefs" were violated because of the defendants' actions. (*Id.*)  Plaintiff claims that he complained about the injury to the left side of his rib cage, where the "bone was protruding out of the rib area." (AC ¶ 13)  However, plaintiff claims that the "nurse" failed to report plaintiff's obvious injuries and

---

[8] Within the dormitory, plaintiff's housing unit is referred to as his "cube."

complaints. (*Id.*)

Plaintiff was issued a misbehavior report on July 1, 2008 by defendants White and Gray. (AC ¶ 15). He states that he lost good time as a result of this misbehavior report. (*Id.*) Plaintiff claims that he was later transferred to the Upstate Correctional Facility SHU as further punishment and retaliation by defendants LaClair, White, Reardon, Gray, and Brassard. (AC ¶ 14). Plaintiff claims that he sent letters to the Inspector General and the Commissioner, but he got no responses, nor was any investigation conducted regarding his allegations. (*Id.*) Plaintiff then states that all the falsified misbehavior reports diminished plaintiff's chances of being released on parole. (*Id.*)

## B. Defendants' Evidence

In support of their motion for summary judgment, defendants have submitted the declaration of defendant Darwin LaClair and the documents associated with the disciplinary hearings that plaintiff alleges were retaliatory. (Dkt. No. 74-3 (LaClair Decl.), 74-4 – 74-11, 74-16 – 74-17; Exs. A-H,[9] M-O (Disciplinary Records)). Defendants have included the grievances plaintiff wrote while he was incarcerated at Franklin Correctional Facility, together with the documents related to those grievances. (Dkt. No. 74-12 – 74-15, 74-21; Exs. I-L, R (Grievance Docs.)) Defendants have submitted plaintiff's Ambulatory Health Record ("AHR") dated July

---

[9] A review of the docket sheet shows that there are documents that should be labeled Defendants' Exs. G and H, but they are not so labeled. To avoid any confusion, the court will also refer to the documents by the number that was assigned to them by the court's electronic filing system (CM/ECF).

7, 2008, reflecting an examination prior to entering SHU, and AHRs, dated July 15 and 16, 2008, reflecting an examination at Franklin, prior to plaintiff's transfer, and an examination at Upstate, after his transfer to that facility. (Dkt. No. 75).

Defendants have filed the "Statement of Material Facts" required by Local Rule 7.1(a)(3). (Dkt. No. 74-2). Plaintiff has not filed a Statement of Material Facts and has not responded to the defendants' motion.[10] Instead of repeating all the facts that the defendants have submitted, the court will cite to the relevant exhibits, as well as relevant parts of defendant LaClair's declaration, during the analysis of the parties' motions for summary judgment.

## II.   SUMMARY JUDGMENT

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. Fed. R. Civ. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id*. However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

---

[10] As defendants argue, plaintiff's motion for summary judgment is defective in many respects and could be denied simply because he did not file the required documents. However, due to the liberality with which pro se pleadings are treated, the court will not recommend denying plaintiff's motion on that technical basis alone. Defendants have submitted a properly supported motion, and the court will proceed to consider the merits.

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006) (citing *Celotex Corp.*, 477 U.S. at 23). The second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings. *Id.*

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Additionally, while a court "'is not required to consider what the parties fail to point out,'" the court may in its discretion opt to conduct "an assiduous view of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.*,

8

258 F.3d 62, 73 (2d Cir. 2001) (citations omitted).

III.  **CAUSES OF ACTION**

In order to properly discuss the merits of plaintiff's amended complaint, I will clarify the plaintiff's claims.  The amended complaint has a section entitled "Breach of Duty to Protect."[11] (AC ¶ 16(A)-16(D)).  Within four subsections, plaintiff appears to be summarizing all his claims.  Plaintiff then lists three "Causes of Action," including retaliatory treatment for filing grievances; conspiracy and excessive force; denial of adequate medical care; and sexually humiliating strip search. (AC ¶¶ 17-23).

The court has read plaintiff's statements and has interpreted his claims as follows:

(1)  Defendants White and Gray harassed plaintiff, filed false misbehavior reports, and transferred plaintiff to Upstate in retaliation for the exercise of his first amendment rights to file grievances, to testify on behalf of another inmate, and to file court actions.

(2)  On July 1, 2008, plaintiff was subjected to excessive force by defendants Hammond, Brassard, and Reardon, and later subjected to a sexually degrading strip search by the same three defendants, in violation of the First, Eighth and Fourteenth Amendments.  Plaintiff may also be claiming that the excessive force was related to the retaliation, and he alleges that

_____

[11] Although plaintiff claims that defendant LaClair failed to take "corrective action," there is no claim that defendant LaClair was aware of, and was deliberately indifferent to, a serious risk of harm to plaintiff prior to the excessive force incidents. *See Farmer v. Brennan*, 511 U.S. 825, 836-37 (1994) (The plaintiff must show that prison officials actually knew of and disregarded an excessive risk of harm to the inmate's health and safety).  The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists and the defendant must also draw that inference. *Id.*  In this case, there are no allegations that any of the defendants failed to protect plaintiff, thus, the court will focus on plaintiff's claims of excessive force.  The amended complaint also has a cause of action that purports to be based on "Municipal Liability." (AC ¶¶ 19-20).  Plaintiff is suing individuals who work for the State of New York, not a municipality, thus, municipal liability claims do not exist.

these three defendants were involved in his retaliatory transfer.

(3)     Defendant LaClair failed to take corrective action against the above
        violations and was also involved in the allegedly retaliatory transfer.

(4)     Plaintiff was denied constitutionally adequate medical care.[12]

## IV.     <u>EXHAUSTION OF ADMINISTRATIVE REMEDIES</u>

### A.     **Legal Standards**

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. §1997e(a), requires an

inmate to exhaust all available administrative remedies prior to bringing a federal civil

rights action.  This requirement applies to all inmate suits about prison life, whether

they involve general circumstances or particular episodes, and regardless of the

subject matter of the claim.  *See Giano v. Goord*, 380 F.3d 670, 675–76 (2d Cir. 2004)

(citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002) (exhaustion requirement applies,

*inter alia*, to excessive force claims)).  Inmates must exhaust their administrative

remedies even if they are seeking only money damages that are not available in prison

administrative proceedings.  *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the

---

[12] In the body of the complaint, plaintiff only alleges that the "nurse" did not report plaintiff's "obvious" injuries after the alleged assault. (AC ¶ 13).  In his paragraph entitled "Breach of Duty to Protect," plaintiff alleges that defendants Hammond, Bressard, and Reardon participated in the denial of medical care, but there is no indication of how these defendants denied plaintiff medical care after the incident since plaintiff states that he was examined by the "nurse," who allegedly failed to report his injuries.  The one additional paragraph discussing medical care does not elaborate on the claim and is impossible to understand. (AC ¶ 23).  Defendants do not address the medical care claim because the nurse was never identified and is not a defendant in this action.  Based on the evidence presented, and plaintiff's failure to respond to the defendants' motion, the court will recommend dismissal of this claim sua sponte.

defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock*, 549 U.S. at 218–19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id*. § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id*. § 701.5(d).

The regulations contain an expedited procedure for inmate allegations of harassment or other misconduct by staff. *Id.* § 701.8. Grievances based upon claims of harassment are forwarded directly to the superintendent, who determines whether the grievance presents a bona fide harassment issue. *Id.* § 701.8(a)-(c). If appropriate, the superintendent may request an investigation by the Inspector General's Office and

must render a decision within twenty-five calendar days of receiving the grievance. *Id.* § 701.8(d)-(f). An inmate may appeal the superintendent's decision to the CORC within seven calendar days of receiving the decision, and if no decision is rendered within twenty-five calendar days, the inmate may appeal the grievance directly to the CORC without a decision by the superintendent. *Id.* § 701.8(g). A final decision by the CORC is required in order to exhaust administrative remedies. *Torres v. Carry*, 672 F. Supp. 2d 338, 344 (S.D.N.Y. 2009).

At the same time that the Second Circuit decided *Giano*, it also decided four other related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or excused.[13] Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom*, 446 F.3d 305, 311–12 (2d Cir. 2006) (citing *Hemphill*, 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement.

---

[13] *See Hemphill v. State of New York*, 380 F.3d 680 (2d Cir. 2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justifying plaintiff's failure to exhaust); *Abney v. McGinnis*, 380 F.3d 663 (2d Cir. 2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman*, 380 F.3d 691 (2d Cir. 2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride*, 380 F.3d 649 (2d Cir. 2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

*Id.*

Although the Second Circuit has not explicitly held that *Hemphill* remains good law after *Woodford*, it has applied the three-part inquiry in recent cases. *See, e.g.*, *Macias v. Zenk*, 495 F.3d 37 (2d Cir. 2007); *Davis v. State of New York*, 311 F. App'x 397, 399 (2d Cir. 2009); *Snyder v. Whittier*, 428 F. App'x 89, 91 (2d Cir. 2011). *See also Toliver v. Dep't of Corrections N.Y.C.*, No. 10 Civ. 5807, 2012 WL 4044627, at *3 n.4 (S.D.N.Y. Sept. 11, 2012) (discussing the absence of a Second Circuit ruling on this issue).[14]

Tier II disciplinary proceedings are exhausted by appealing to the Superintendent. N.Y. Comp. Codes R. & Regs., tit. 7 § 253.8. Tier III disciplinary hearings, known as Superintendent's Hearings, are appealed to the Commissioner. *Id.* § 254.8. The *results* of disciplinary hearings are not "grievable." *Id.* § 701.3(e)(1)-(2). Courts have questioned whether including information in a disciplinary appeal regarding the challenged conduct is sufficient to satisfy the exhaustion requirement. *See Johnson v. Testman*, 380 F.3d at 697. The essence of the exhaustion requirement is that the inmate must provide "enough information about the conduct of which they

---

[14] This court also notes that, based upon the concurring opinion in *Woodford*, it appears that the Second Circuit decisions have *not* been overruled in that respect. In his concurring opinion in *Woodford*, Justice Breyer specifically noted that two circuits, the *Second* Circuit and the Third Circuit that have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts [in *Woodford*] have concluded that the PLRA's proper exhaustion requirement is not absolute." *Woodford*, 548 U.S. at 104 (Breyer, J. concurring) (citing *Spruill v. Gillis*, 372 F.3d 218, 232 (3d Cir. 2004); *Giano v. Goord*, 380 F.3d 670, 677 (2d Cir. 2004)). Justice Breyer then stated that on remand, the lower court should "similarly" consider any claims that the inmate might have concerning whether his case "falls into a *traditional exception that the statute implicitly incorporates*." *Id.* (emphasis added). This statement implies that there are still exceptions that a court may consider.

complain to allow prison officials to take appropriate responsive measures. *Id.*

In *Johnson*, the Second Circuit held that whether or not the plaintiff's disciplinary appeals were enough to "alert" the defendants to the nature of the alleged wrong was not clear. The Second Circuit sent the case back to the District Court to determine whether plaintiff was justified in raising his complaint about the defendant in his disciplinary appeal, rather than filing a separate grievance, and whether the plaintiff's description of the defendant's conduct in the disciplinary appeal was sufficient to afford corrections officials time an opportunity to address the complaints internally. *Id.* at 698 (quoting *Porter*, 534 U.S. at 525).

## B. Application

Defendants argue that the majority of plaintiff's First Amendment claims are unexhausted. Based on the above-cited case law, the court will examine plaintiff's grievances as well as his disciplinary hearings to determine whether he sufficiently alerted the state officials to the nature of the alleged wrongs.

### 1. Grievances and Letters

Plaintiff's first grievance was filed against defendant White after the June 21, 2008 misbehavior report, in which defendant White charged plaintiff with being "untidy," with harassment, and with violating a direct order in conjunction with a disagreement over how plaintiff cleaned his cube. The grievance complained that defendant White used profanity, and stated that defendant White filed the misbehavior report against plaintiff because "he knew [plaintiff] would write [White] up because I have warned him several times in the past 2 -months to stop disrespecting me and

14

cursing at me. To justify [himself] C.O. White took my I.D. and placed me on keeplock pending." (Dkt. No. 74-13 at 1).

Because the grievance alleged staff misconduct, it was sent to defendant LaClair pursuant to the regulations. On June 30th, Sergeant Hammond interviewed plaintiff and his witnesses. (Dkt. No. 74-13 at 5). Sergeant Hammond interviewed defendant White on July 1, 2008. (*Id.*) Sergeant Hammond found the grievance without merit. (*Id.*) The Superintendent denied the grievance, but plaintiff did not appeal to the CORC. There was no claim of retaliation for the exercise of any first amendment rights in the grievance.

On June 28, 2008, plaintiff wrote a letter to both defendant Superintendent Darwin LaClair and Deputy Commissioner Lucien J. LeClaire, Jr.[15] (Dkt. No. 74-14 at 1-7). In this letter (the same letter was sent to both individuals), plaintiff complained about the cleaning incident, and this time, made additional statements, alleging that defendant White threatened plaintiff with "lockdown" for "whatever I can set you up for." (Dkt. No. 74-14 at 2). In the letter, plaintiff also states that "suddenly today," defendant White found "shanks" near his own "area," but that plaintiff was sure that defendant White would find "a shank or some type of weapon in my cube, or one of my witnesses." (*Id.*) Plaintiff stated that he felt "very threatened" by defendant White, however, there was no claim in plaintiff's June 28th letter that White was retaliating against plaintiff for the exercise of his first amendment rights.

Plaintiff's June 28th letter to Superintendent LaClair was referred to Lieutenant

_____

[15] Notwithstanding the similarity of the two names, these individuals are two different people.

Larry, and Sergeant DeShane investigated the accusations, finding that plaintiff's grievance was "in retaliation" for the June 21st misbehavior report that defendant White issued against plaintiff. (Dkt. No. 74-14 at 3). Deputy Commissioner LeClaire referred plaintiff's letter to Norman Bezio, the Director of Special Housing/Inmate Disciplinary Programs, for "response." (Dkt. No. 74-14 at 5). Mr. Bezio referred the letter back to defendant LaClair, stating that allegations of staff misconduct should be directed to facility officers through the established grievance mechanism or by writing to the Superintendent. (*Id.*) Although the letters also resulted in an investigation, plaintiff did not properly complete the administrative remedy procedure when he failed to get a satisfactory result from grievance.[16] Plaintiff never claimed that White was retaliating against him for the NYPD law suit or because plaintiff testified for Inmate Pryor against defendant White.

Plaintiff's second grievance was dated July 6, 2008 and filed on July 18,[17] after the July 1, 2008 incident that lead to another misbehavior report being filed against plaintiff. (Dkt. No. 74-21; Def.s' Ex. R). Plaintiff alleges that defendant Gray came to his cell and demanded "in a nasty manner," that plaintiff give Gray his I.D. (Dkt. No. 74-21 at 28). Plaintiff claims that he was then taken out of his cell for "unknown reasons," assaulted, and then taken to SHU. In the July 6th grievance, he mentions the

---

[16] It appears that the two investigations of the same incident were conducted together. Defendant White's responses are addressed to both Sergeant DeShane (Dkt. No. 74-14 at 4) and to Sergeant Hammond. (Dkt. No 74-13 at 7).

[17] Plaintiff had been transferred to Upstate Correctional Facility by the time the grievance was received by the facility officials.

assault, and then states that he was assaulted again when he arrived in SHU. He claimed that he did not find out until the next day that he was being "falsely" charged with threatening an officer. (*Id.* at 30). He also stated that he received the misbehavior report in retaliation for filing a grievance against Officer White.[18] (*Id.* at 31). He also claimed that the conduct by Gray and White "stemmed" from his being a witness for Inmate Duckett. (Dkt. No. 74-21 at 31). However, he never mentioned the allegedly humiliating strip search, to which he was subjected prior to being admitted to SHU. (*Id.* at 28-34). Nor did plaintiff mention that the nurse did not report his injuries or that he needed or was denied proper medical treatment after the incident. (*Id.* at 29).

The IGRC again passed the grievance through to the Superintendent because it alleged staff misconduct. (Dkt. No. 74-21 at 35). The Superintendent referred plaintiff's claims for investigation, but found that the grievance had no merit.[19] (*Id.* at 13, 10) Plaintiff did appeal this grievance to the CORC. In his appeal to the CORC, plaintiff added the allegation that, upon his arrival at SHU, the strip search was sexually humiliating. (*Id.* at 9). The CORC found no merit to the allegations, and denied the grievance. (*Id.* at 1) In doing so, the CORC noted that "the grievant has raised a separate issue in his appeal statement that was not addressed in his original complaint. That issue could be the subject of a separate grievance." (Dkt. No. 74-21

---

[18] Plaintiff can only be referring to the grievance that he filed against defendant White on June 21st because that is the only other grievance he filed at Franklin, and thus, the only grievance against defendant White.

[19] There is a typographical error in the Superintendent's denial of plaintiff's grievance. (Dkt. No. 74-21 at 10). The decision states that the grievance is found to be "with" merit, but then the grievance is denied. Thus, it is clear that the sentence should read "without" merit.

at 1). Essentially, the CORC did not consider the plaintiff's final allegation because he raised it for the first time in his appeal to the CORC. Plaintiff never brought a separate grievance. Thus, plaintiff did not properly exhaust his claim of sexual harassment.[20] Plaintiff also never brought a grievance, challenging his transfer as retaliatory. He never mentioned his transfer in the appeal of his grievance, although he attempted to add other facts to his appeal, and even though he had been transferred at the time that he filed his appeal. Thus, his claims of retaliatory transfer are unexhausted.[21]

## 2.    Disciplinary Hearings and Appeals

Plaintiff had four disciplinary hearings, relating to misbehavior reports that he claims in his amended complaint were filed against him in retaliation for exercising his constitutional right to act as a witness for another inmate as well as for his grievances and/or court litigation. (Dkt. No. 74-4 at 1) (Inmate Disciplinary History). During the hearing on June 12, 2008, for an incident on June 6, 2008, plaintiff stated

---

[20] The court notes that although, in passing, plaintiff also states that this alleged sexual impropriety violated his "religious" rights, there is no mention of religion anywhere in the plaintiff's grievances or disciplinary hearings. Thus, to the extent that plaintiff is attempting to belatedly add a First Amendment religion claim, it is unexhausted and will not be considered.

[21] Although an inmate may not be transferred solely in retaliation for the exercise of a constitutional right, the inmate has no constitutional right to be incarcerated in any particular correctional facility, and may be transferred for any reason, or no reason at all. *Montayne v. Haymes*, 427 U.S. 236, 243 (1976); *Meachum v. Fano*, 427 U.S. 215, 224-25 (1976); *Sher v. Coughlin*, 739 F.2d 77, 80 (2d Cir. 1984). *See Meriwether v. Coughlin*, 879 F.2d 1037, 1045 (2d Cir. 1989) (officials have broad discretion to transfer inmates, but may no transfer them solely in retaliation for the exercise of their constitutional rights). Aside from his failure to exhaust his administrative remedies, plaintiff asserts only in a conclusory fashion that all the defendants were involved in his transfer. He has no basis for this statement.

that "for some reason," the officer[22] "had it in for" plaintiff and Inmate Pryor. (Dkt. No. 74-9 at 6).

Defendant White filed the June 21, 2008 misbehavior report against plaintiff. At the hearing, held on June 25, 2008, plaintiff alleged that defendant White used profanity against plaintiff, and at the end of the hearing, the hearing officer stated that he would have defendant White's alleged use of profanity against plaintiff investigated. (Dkt. No. 74-11 at 5, 8, 11, 24). Plaintiff also stated that defendant White "had it out for" him. (*Id.* at 8). In his appeal from the hearing officer's determination, plaintiff alleged that defendant White filed the "false" misbehavior report in "retaliation," to cover up for his use of profanity against plaintiff, not in retaliation for grievances or other protected activity. (Dkt. No. 74-10 at 1). Plaintiff made the same statements at the disciplinary hearing that he made in his June 21, 2008 grievance regarding the alleged reason for the misbehavior report.

Plaintiff also had a disciplinary hearing as the result of the July 1st misbehavior report. The hearing officer found plaintiff guilty of the misbehavior and sentenced plaintiff to a period of time in SHU and a one month loss of good time. (Dkt. No. 74-4 at 1). During the hearing, plaintiff argued that defendant White was retaliating against plaintiff for filing grievances against him, but never mentioned that plaintiff had been a witness for another inmate's grievance against White, even though he did mention his testimony on behalf of another inmate in his July 6, 2008 grievance. (Dkt. No. 74-

---

[22] Officer Gray wrote the misbehavior report on June 6, 2008. Plaintiff alleges that the officers were all defendant White's friends and were helping him retaliate against plaintiff.

17 at 3). Plaintiff told the hearing officer that it was the fifth time that defendant White used obscene language against plaintiff "and I never wrote him up before." (*Id.*) Unfortunately, the second part of the disciplinary hearing was inaudible, and could not be transcribed. (*Id.* at 5).

The issues that appear to be exhausted are the two alleged assaults on July 1, 2008 (one on the housing unit and the second while plaintiff was being admitted to SHU on the same day) and false misbehavior reports in retaliation for filing grievances against defendant White beginning on June 25, 2008 (when plaintiff filed his first grievance against defendant White) and perhaps the claim that White was also retaliating against plaintiff because he testified on behalf of other inmates, against defendant White.[23] Although these are the only issues that are exhausted, the court will consider some of the other issues because there are alternative reasons for their dismissal.

## V. <u>RETALIATION</u>

### A. **Legal Standards**

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003). The plaintiff must establish a causal connection between the protected conduct or

---

[23] It is questionable whether this claim was ever brought to the state officials properly, but given the liberality with which pro se cases are treated, the court will consider that this claim is exhausted.

speech and the adverse action. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004).

A prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). However, if the defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights are implicated even if the plaintiff were entitled to, and did receive, full procedural due process. *Franco v. Kelly*, 854 F.2d 584, 588-89 (2d Cir. 1988). Any action taken by a defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d at 381 (citations omitted). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett*, 343 F.3d at 137 (citation omitted). Accordingly, plaintiff must set forth non-conclusory allegations. *Id.* In the disciplinary hearing context, the type of evidence required to establish a causal connection between plaintiff's protected activity and the defendant's alleged adverse action includes:

21

temporal proximity, prior good discipline, a finding of not guilty at the disciplinary hearing, and statements from the defendants regarding their motives. *Santiago v. Whidden*, No. 3:10-CV-1839, 2012 WL 668996, at *7 (D. Conn. Feb. 9, 2012) (citing *Barclay v. New York*, 477 F. Supp. 2d 546, 558 (N.D.N.Y. 2007)).

Even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* (citing, *inter alia*, *Mount Healthy Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977)). Once the plaintiff's burden of proving the three-part test is satisfied, "the burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation." *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir.2002) (citing *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.1996)). Thus, under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham*, 89 F.3d at 79 (citations omitted).

### B. Application

#### 1. First Three Misbehavior Reports

In the amended complaint, plaintiff alleges that the June 2, 2008 misbehavior report was issued by Officer Barse to both plaintiff and Inmate Pryor because they testified on behalf of Inmate Duckett, who was allegedly assaulted by defendant White. (AC ¶ 3). Plaintiff also claims that this misbehavior report was filed against plaintiff because defendant White discovered that plaintiff had a pending law suit

against the N.Y.P.D. Intelligence Division.[24] (AC ¶ 4). Filing grievances, and filing lawsuits are all protected by the First Amendment, thus, retaliation for this conduct would be actionable. *See Tafari v. McCarthy*, 714 F. Supp. 2d 317, 373 (N.D.N.Y. 2010) (filing grievances). However, it was unclear in 2008, and is still unclear, whether testifying on behalf of another inmate would be protected conduct. *See e.g. Pettus v. McGinnis*, 533 F. Supp. 2d 337, 340 (W.D.N.Y. 2008) (court found no authority in 2008 clearly establishing that an inmate's testimony on behalf of another inmate was constitutionally protected). *See also Lewis v. Johnson*, 9:09-CV-482 (TJM/ATB), 2010 WL 3785771, at *15, 22 (N.D.N.Y. Aug. 5, 2010) (Report-Recommendation) (also affording qualified immunity, notwithstanding possibility that adverse action was motivated by inmate's complaints about the treatment of another inmate), *adopted* 2010 WL 3762016 (N.D.N.Y. Sept. 20, 2010).[25]

An analysis of the other factors required for a retaliation claim shows that plaintiff cannot establish a causal connection between his protected activity and the defendants' adverse action. Additionally, a review of the disciplinary hearings shows that defendants would have taken the same action regardless of any "improper" motive in bringing the disciplinary charges.

Defendants' Exhibit C is the hearing packet for the June 4, 2008 disciplinary

---

[24] Plaintiff cannot claim that the June 2, 2008 misbehavior report was in retaliation for filing grievances against defendant White because plaintiff's first grievance against this defendant was not filed until June 21, 2008.

[25] The doctrine of qualified immunity shields government officials from liability for civil damages when their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

hearing. (Dkt. No. 74-6). The packet contains the plaintiff's misbehavior report, the disposition sheet, and a letter that plaintiff wrote to defendant LaClair the day before the hearing. (Dkt. No. 74-6 at 4, 5-7). Defendant LaClair wrote a note at the top of plaintiff's letter, stating that the letter was a "Prehearing Statement" and that it would be considered by the hearing officer at the June 4, 2008 hearing. (*Id.* at 5). Exhibit C also contains plaintiff's appeal to the Superintendent of the disciplinary hearing and the order affirming the hearing officer's finding, signed by the Superintendent's designee, Captain Williams. (*Id.* at 9).

The court would first point out that, contrary to plaintiff's claim, Inmate Pryor was not involved in this misbehavior report, although plaintiff testified at his disciplinary hearing that Inmate Pryor was present at the time. (Dkt. No. 74-7 at 4; Def.s' Ex. D). The misbehavior report charges plaintiff with disobeying Officer Barse's order to punch out at the Tailor Shop. The report specifically states that there were *no* other inmates involved in the misbehavior. (Dkt. No. 74-6 at 4). The misbehavior report states that plaintiff was standing by the time clock five minutes after Officer Barse had given the order for all inmates to punch out, and that plaintiff held his card over the time clock for an additional 30 seconds before he punched out. Officer Barse also noticed that plaintiff punched out for another inmate, but could not determine who that inmate was because plaintiff put the card on the rack before Officer Barse could make that determination.[26]

---

[26] That inmate's identity remains unknown, and there is no indication that the inmate for whom plaintiff was punching out was Pryor, even though Pryor was apparently in the Tailor Shop at the same time. In any event, according to the documents there was no misbehavior report issued to

A review of the disciplinary hearing shows that plaintiff pled "[n]ot guilty with explanation." (Dkt. No. 74-7 at 3; Def.'s Ex. D). At the hearing, plaintiff rescinded his request for the two witnesses he had chosen. (*Id.*) Plaintiff explained that the civilian supervisor would call "tools" at approximately 5:15 p.m. However, plaintiff was required to pray every day at approximately 5:15 or 5:20 p.m., and "everybody in the shop knows I do that . . . . I sit in the chair and I do my prayer." (*Id.* at 4). Plaintiff states that he is the last one to be frisked because of that. He, Spencer, and Pryor were the last ones to get frisked. (*Id.*) Plaintiff states that it was 5:29 p.m., and he heard Officer Barse say "I am locking the door now get [sic.]" Plaintiff admits that he heard Officer Barse, but did not know to whom the officer was speaking, "so I held my thing there for thirty seconds and then I punched out *I should have punched out right away.*" (*Id.*)

Plaintiff essentially admitted the conduct that formed the basis for the misbehavior report. Additionally, although plaintiff stated that everybody in the shop knew that he prayed at a certain hour, he also stated in response to a question from the hearing officer, that Officer Barse was *not* the regular officer in the Tailor Shop, and that it was the "first time [plaintiff] saw him working there since I been working there for about two months." (*Id.* at 5). Thus, it is clear that Officer Barse would not have known that plaintiff prayed everyday at a certain hour or that he punched out after everyone else because, according to plaintiff, it was the first day that Officer Barse ever worked in the Tailor Shop. The hearing officer then told plaintiff that different

---

any other inmates *as a result of this incident*.

officers did things differently, not to "assume things," and to check with the officer to make sure that "things don't get jammed up." (*Id.*) The hearing officer then stated that plaintiff could have obeyed Officer Barse's order in a more timely fashion. (*Id.*)

Based upon the plaintiff's own testimony, admitting that he held his card over the time clock for 30 seconds before he punched out and that Officer Barse was not aware of plaintiff's alleged routine in the Tailor Shop, it is clear that the misbehavior report would have been written without any retaliatory motive. Plaintiff did not understand why he was found guilty of "being out of place" since he was in the Tailor Shop where he was supposed to be. (*Id.* at 7). However, the hearing officer explained that he was "out of place" because the officer told him to leave, and he stayed. (*Id.*)

The hearing officer at the June 4th hearing also discussed a February 20, 2008 misbehavior report because plaintiff had included a discussion of that incident in the letter that he sent to the Superintendent. (*Id.* at 6). Although plaintiff is not challenging, and did not exhaust his remedies with respect to, the February 20th incident, it is clear from the discussion of the incident that plaintiff committed the conduct of which he was accused in February.[27] (*Id.*) The incident involved a disagreement over where plaintiff was going to sit in the mess hall. Plaintiff explained that he mistakenly sat in a spot that was reserved for people who are helping inmates in wheelchairs. Plaintiff stated that he was following someone else and did not hear the officer speak to him, so "I didn't hear him okay and he had to tell me a second

---

[27] The court is only mentioning this incident for purposes of solidifying its recommendation regarding the lack of any evidence of false misbehavior reports/retaliation in this case.

time.  Then Officer Allen . . . wrote the ticket.  He cursed at me in the messhall." (*Id.*)

Plaintiff alleges that later, the Officer grabbed his arm, but plaintiff stated that the

incident had been "dealt with." (*Id.*)  Defendant White was *not* involved in either of

these incidents.

The third misbehavior report was dated June 5, 2008, and was issued by Officer

Gray. (Dkt. No. 74-8 at 4; Def.s' Ex. E).  Plaintiff was charged with failure to obey a

direct order and violating "count procedures." (*Id.*)  Plaintiff was sleeping during the

inmate count and Officer Gray had to wake him.  Plaintiff had been previously warned

about this conduct. (*Id.*)  The disciplinary hearing was conducted on June 12, 2008.

The charge of disobeying an order was dismissed by the review officer prior to the

hearing, and the documents indicate that plaintiff pled "*guilty*" to the "count"

violation. (*Id.* at 3).  The hearing transcript confirms this finding. (Dkt. No. 74-9 at 3-

4; Def.s' Ex. F).  Plaintiff stated "well I'll plead guilty with explanation cause I was

laying down." (*Id.* at 4).  He then admitted that "I was sleeping and [the officer]

kicked my bed." (*Id.*)

Later during the July 12th testimony, plaintiff states that Officer White "got it in

for me and him, alright." (*Id.* at 6).  Plaintiff admitted that he was sleeping, but

claimed that the officer should have given him a warning. (*Id.*)  The hearing officer

pointed out that there were warnings to plaintiff listed in the log book. (*Id.* at 7; *see*

Dkt. No. 74-16 at 5 (indicating a warning to Holmes on 4/20/08 and 5/14/08)).  The

officer asked plaintiff why he was pleading guilty if he believed he should have been

warned, but plaintiff stated that "I plead guilty because I was sleeping.  I won't lie."

(*Id.*) Regardless of plaintiff earlier allegation that White, who was not the individual who gave him this ticket, had it "in for" plaintiff, his admission that he was guilty and the documents showing that he was warned in the past, support the defense that the misbehavior report would have been issued for completely appropriate reasons.

Plaintiff has not shown any nexus between his "protected" activity and the first three misbehavior reports. Plaintiff did not write his first grievance against defendant White until after the fourth misbehavior report was written, so the first three could not have been in retaliation for writing grievances. As stated above, in 2008, it was not clear that plaintiff's alleged testimony on behalf Inmate Pryor against defendant White was constitutionally protected. Plaintiff's assumption that defendant White was the instigator of the misbehavior reports is completely speculative because White did not write any of the first three misbehavior reports. Finally, plaintiff was found guilty of all three violations, and in fact, pled guilty to one of them. Thus, it is clear that defendants have shown that the same actions would have been taken, regardless of a retaliatory motive.

The fourth misbehavior report was issued for an incident that occurred at approximately 8:45 a.m. on June 21, 2008. This was the first incident in which defendant White was the charging officer. The misbehavior report resulted from a disagreement between plaintiff and defendant White over how plaintiff's cell should be cleaned. (Dkt. No. 74-10 at 5-6). This misbehavior report could not have been written in retaliation for grievances against White himself since plaintiff's first grievance against White was written on the same day of the incident that formed the

basis of the misbehavior report, complaining about White's behavior during the incident. In his amended complaint, plaintiff alleges that the "harassment and abuse seemed to clearly start after defendant White found out that plaintiff . . . had a pending law-suit against the N.Y.P.D. . . . ." (AC ¶ 4). Plaintiff also states that his "entire defense" during the resulting disciplinary hearing was "the circumstances surrounding plaintiff being a witness for two different inmates" who had filed grievances against defendant White. (AC ¶ 7).

Plaintiff's conclusory assertion that the harassment *seemed* to start after defendant White found out about a law suit against police officers from New York City does not rise to the level of the required nexus between adverse action and plaintiff's protected conduct.[28] Plaintiff claims that defendant White "found out" about the law suit when he escorted plaintiff to telephone conferences with the court. Even assuming that defendant White was aware of plaintiff's law suit against individuals from the N.Y.P.D., these individuals did not work with White at Franklin, they did not work in the same city as he did, and did not even work for the Department of Corrections and Community Supervision ("DOCCS"). Plaintiff's completely speculative assumption that the alleged harassment that followed was based upon this "discovery," particularly when the first three misbehavior reports were not written by

---

[28] The court may take judicial notice of the fact that plaintiff filed two law suits, one in the Eastern District of New York, and the other in the Southern District of New York close to the time of the conduct of which plaintiff complains in this case. *See Holmes v. Dep't of N.Y.P.D.*, 06-CV-2140 (E.D.N.Y.) (RJD/LB); *Holmes v. Frasier*, No. 07 Civ. 6044 (S.D.N.Y.) (LAK). A letter, filed in *Holmes v. Dep't of NYPD*, indicates that both cases were settled in plaintiff's favor on May 6, 2008. (Dkt. No. 44 in 06-CV-2140).

defendant White, does not form the basis for a constitutional retaliation claim. *See, e.g., Hare v. Hayden*, 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (plaintiff failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in) (collecting cases); *Ciaprazi v. Goord*, 9:02-CV-915 (GLS/DEP), 2005 WL 3531464, at *8-9 (N.D.N.Y. Dec. 22, 2005) (granting summary judgment and dismissing retaliation claim based only on plaintiff's conclusory allegations that the manifest falsity of the misbehavior report and testimony during the disciplinary hearing indicated the disciplinary matters were motivated by retaliatory animus due to grievances plaintiff filed against individuals other than the defendants involved in the disciplinary action).

Attached to plaintiff's motion for summary judgment is an unsworn statement written by Inmate Jarrett Henry, in which he states that he told plaintiff that Inmate Henry "always" heard defendant White talking about plaintiff and his law suit against the N.Y.P.D., "saying things like [plaintiff] is going to learn the hard way not to mess with the Big Blue." (Dkt. No. 71 at 6). An unsworn, unsigned, undated statement cannot form the basis for a summary judgment motion, and plaintiff did not respond to the argument in defendants' motion that this document should not be considered.

Although plaintiff states that the "entire" defense at his disciplinary hearing was that defendant White was retaliating against him, a review of the disciplinary hearing transcript shows that plaintiff made no such argument during his disciplinary hearing. Plaintiff's defense was that he properly cleaned his "cube," and that defendant White used profanity against plaintiff. Plaintiff claimed at the hearing, and on appeal of that hearing, that defendant White wrote the misbehavior report to cover up his own use of profanity against plaintiff, not that White was retaliating against plaintiff for an unrelated law suit or for grievances that had not yet been written.

Plaintiff stated once during the June 25th hearing that "[h]e's been, and, he's had it out for me for the longest . . . ok?" (Dkt. No. 74-11 at 8) (omission in original). Plaintiff also stated that White "threatened" plaintiff four times to "write [plaintiff] a ticket." (*Id.* at 6). Plaintiff's appeal stated that White's report was "clear retaliation to cover up his useing [sic] profane language on Mr. Holmes." (Dkt. No. 74-10 at 1). There is ***no indication*** from the disciplinary hearing or from the appeal that plaintiff believed defendant White was retaliating against him for the exercise of a constitutional right.

The same is true for the grievance, written by plaintiff on June 21, 2008 after defendant White wrote the misbehavior report that was dated the same day. The basis of the grievance was the defendant White allegedly used profanity in dealing with plaintiff, during the incident that resulted in the misbehavior report. Plaintiff never mentioned retaliation at all. (Dkt. No. 74-13 at 1). In the grievance, plaintiff states that defendant White knew that plaintiff would "write him up" because plaintiff had

warned defendant White several times in the past ***two months*** to stop "disrespecting" plaintiff and "cursing" at him. (*Id.*) Plaintiff states that "[t]o justify his [sic] self C.O White took my I.D. and placed me on keep lock pending." (*Id.*) Verbal harassment and profanity, no matter how unprofessional and offensive does not rise to the level of a constitutional violation. *Shabazz v. Pico*, 994 F. Supp. 460, 474 (S.D.N.Y. 1998); *see also Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) (a guard calling a plaintiff names did not establish any "appreciable injury" and dismissal of the claim was proper).

On June 28, 2008, plaintiff wrote a letter to the Superintendent, still complaining about the June 21st incident, but adding that on June 28, 2008, defendant White found "shanks" around his own desk area. (Dkt. No. 74-14 at 2; Def.s' Ex. K). Plaintiff then stated that he was afraid that defendant White would "plant some weapon" in plaintiff's cell or the cell of one of his "witnesses." (*Id.*) This was complete speculation by plaintiff, and he never mentioned retaliation.

### 2. Final Misbehavior Report

The final misbehavior report, written on July 1, 2008, before plaintiff was transferred out of Franklin, was written by Officer Gray,[29] and involved plaintiff having a verbal exchange with this officer, ultimately telling Officer Gray that there was a "shank" with his name on it. (Dkt. No. 74-16 at 4; Def.s' Ex. M). Plaintiff was given a Tier III hearing, and was found guilty of the misbehavior. He was sentenced to three months in SHU, together with a three month loss of various privileges. (Dkt.

---

[29] Once again, the misbehavior report was not written by defendant White.

No. 74-16 at 1). Plaintiff was also sentenced to a one month recommended loss of good time. (*Id.*) Plaintiff appealed, but the determination was affirmed on August 14, 2008. (Dkt. No. 74-18 at 1).

Although the transcript of the Tier III hearing was mostly "inaudible," and the transcription was never completed, it is clear that plaintiff was complaining about Officer White swearing at him. (Dkt. No. 74-17 at 3; Def.s' Ex. N). In the part of the transcript that is available, there is no allegation of why plaintiff believed that Officer White was allegedly targeting plaintiff for profanity or false misbehavior reports. The court notes that the plaintiff brought his June 28th letter to the hearing, and before the tape became inaudible, the hearing officer stated that he would consider the letter in his decision. (*Id.* at 5).

In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Supreme Court held that a section 1983 action, seeking damages is not cognizable if a decision in favor of the plaintiff would necessarily invalidate a criminal conviction unless the conviction or sentence had been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal, or called into question by a federal habeas court. 512 U.S. at 486-87. *Edwards v. Balisok*, 520 U.S. 641 (1997) extended the rationale in *Heck* to section 1983 challenges to prison disciplinary proceedings in which a decision in plaintiff's favor would necessarily reverse the administrative decision revoking a plaintiff's good-time credits, thereby affecting the length of the plaintiff's confinement. 520 U.S. at 644.

In this case, although plaintiff is not challenging the due process rights afforded

to him at his hearing,[30] if the court determines that Officer White's misbehavior report was false and in retaliation for plaintiff's grievances or other constitutionally protected activities, then the court would necessarily be finding that the result of the disciplinary hearing was invalid. However, as stated above, plaintiff's disciplinary hearing was affirmed on appeal, and plaintiff did not challenge the finding in an Article 78 proceeding. Thus, at this time, the court cannot consider the last misbehavior report on the merits of his retaliation claim.[31] Plaintiff cannot sustain his burden to show that there is no question of fact, and summary judgment should be granted in his favor, nor has he refuted the defendants' showing that there is no question of fact, but that summary judgment may be granted in their favor on the retaliation claim.

## VI. EIGHTH AMENDMENT/EXCESSIVE FORCE

### A. Legal Standards

The Eighth Amendment prohibits the "'unnecessary and wanton infliction of pain.'" *Baker v. Willett*, 42 F. Supp. 2d 192, 196 (N.D.N.Y. 1999) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).

---

[30] Although the amended complaint refers to a denial of "due process," none of the hearing officers are defendants, and a review of all the hearings shows that plaintiff was afforded the required procedural due process during the hearings. He does not allege otherwise.

[31] The Second Circuit has held that an inmate who is given a "mixed sanction" can avoid the "favorable termination" rule of *Heck* and *Edwards* if he forever waives any consideration of the good time portion of his disciplinary sentence. *Peralta v. Vasquez*, 467 F.3d 98, 104–106 (2d Cir. 2006), *cert. denied*, 551 U.S. 1145 (2007). In such cases, the court would afford plaintiff the opportunity to waive any consideration of good time. However, in this case, regardless of plaintiff's waiver, he still could not show that defendant Gray, who wrote the July 1st misbehavior report, was retaliating against plaintiff for a grievance that he filed against defendant White or that defendant Gray was retaliating against plaintiff at the behest of defendant White for a law suit that plaintiff filed against the NYPD. There is no indication that defendant Gray was aware of the law suit filed by plaintiff.

When the use of excessive force is alleged, the court must determine whether the force "was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitely v. Albers*, 475 U.S. 312, 320–21 (1986) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. (1973)). In order to meet the constitutional standard for excessive force, the defendants' conduct must be "'inconsistent with the contemporary standards of decency' and 'repugnant to the conscience of mankind.'" *Whitely*, 475 U.S. at 327.

Minor uses of physical force do not reach the constitutional level as long as the force used is not "repugnant to the conscience of mankind." *Hudson v. McMillian*, 503 U.S. 1, 9–10 (1992). However, the court must determine the need for the force, the relationship between the need and the amount of force used, the extent of the injury suffered, the extent of the threat to the safety of staff and inmates, and any efforts made to temper the severity of a forceful response. *Whitely*, 475 U.S. at 321. Not every push or shove, even if it seems unnecessary, amounts to a violation of the constitution. *Hudson*, 503 U.S. at 9–10 (*de minimis* force); *Johnson v. Glick*, 481 F.2d at 1033.

### B.    Application

In the amended complaint, plaintiff only refers to July 1, 2008 as the date that he was allegedly subjected to excessive force.[32]  He claims that he was assaulted at his

---

[32] The court notes that, in his motion for summary judgment, plaintiff now mentions an alleged "use of force incident" that occurred on February 20, 2008. (Dkt. No. 71 at 2, ¶ 4). This is the first time in this case that plaintiff has mentioned an incident involving a "use of force," occurring on

cell and when he arrived at SHU, where he was hit again and subjected to a sexually

humiliating strip search.  However, the conduct described by plaintiff as having

occurred on July 1, 2008 does not rise to the level of excessive force, even as plaintiff

---

February 20, 2008.  Defense counsel interpreted plaintiff's statement as an attempt to raise a new claim in his summary judgment motion and argued that this claim is unexhausted. (Def.s' Memo. at 14-15).  If plaintiff were trying to raise a new claim, he could not do so in a summary judgment motion, even if he had filed a proper motion. *See Hickey v. State Univ. of New York at Stony Brook Hosp.*, No. 10-CV-1282, 2012 WL 3064170, at *5 (E.D. N. Y. July 27, 2012) (citations omitted).  The court finds, however, that plaintiff is not attempting to raise a new claim.  First, although plaintiff mentions a use of force on February 20, 2008, he does not state how the use of force relates to a constitutional violation.  A reading of the entire paragraph shows that the reason he is mentioning a use of force on February 20, 2008 is because he is attempting to argue that defense counsel lied in his response to plaintiff's interrogatories, when counsel stated that there were no unusual incident reports or use of force reports pertaining to plaintiff while he was housed at Franklin Correctional Facility.  Plaintiff claims that the incident was "reported," implying that defendants have failed to produce existing records.  Defendants have submitted a misbehavior report, issued to plaintiff on February 20, 2008, together with the documents associated with the Tier II hearing that ultimately resulted from that report. (Dkt. No. 74-5 at 4).  There is no indication from the misbehavior report or from the hearing on the misbehavior report that plaintiff claimed that any use of force occurred before, during, or after the incident.

The misbehavior report involved an incident that occurred in the mess hall, during which plaintiff sat in an unauthorized spot and then complained about having to move. (*Id.*).  When Officer Allen attempted to counsel plaintiff about his behavior, plaintiff swore at him. (*Id.*)  Plaintiff was found guilty after a Tier II hearing, but did not appeal.  Plaintiff appears to have discussed the issue briefly in his letter to defendant LaClair, dated June 3, 2008, that plaintiff wrote after he was issued the June 2, 2008 misbehavior report. (Dkt. No. 74-6 at 5).

Plaintiff states in the second paragraph of his June 3, 2008 letter that the June 2 misbehavior report was his "second Tier II ticket," and that the officer "lied on" plaintiff the first time, but that plaintiff did not appeal the guilty determination. (*Id.*)  Although it is not clear, the court assumes that plaintiff is referring to the February 20, 2008 incident because plaintiff claims that the officer "grabbed" plaintiff's arm "roughly in the mess hall in front of over 50 prisoners," and that this action "embarrassed" the plaintiff in front of all the other prisoners. (*Id.*)  He then states that a short sergeant "roughed me up" outside of the mess hall by pushing plaintiff's face into the wall and throwing handcuffs on him tightly. (Dkt. No. 74-6 at 6).

Plaintiff also admits in the June 3, 2008 letter, that he "didn't . . . write . . . and complain or place an appeal in for their decision." (*Id.*)  It is clear from plaintiff's own letter that he never complained about any "use of force" at the time that it allegedly occurred.  The misbehavior report corroborates this finding. (Dkt. No. 74-6 at 4).  Question No. 9 on the misbehavior report form specifically asks whether physical force was used, and Officer Allen checked "NO." (*Id.*)  Thus, plaintiff's allegation that defense counsel committed some sort of misconduct by failing to turn over "use of force" reports, based on this February 20, 2008 incident, is meritless.

has described it.  As stated above, verbal abuse and harassment, no matter how offensive or inappropriate, does not rise to the level of a constitutional claim.  *Purcell, supra*.  Plaintiff describes the "excessive force" on July 1, 2008 as Sergeant Hammond "roughly dragged" plaintiff out of his cell.  (AC ¶ 10).  Plaintiff's arm was "twisted behind his back and he was snatched by the back of his neck by defendants Sgt. Hammond, and Corrections Officers [Brassard] and Reardon." (*Id.*)  The officers then "dragged" plaintiff out of the dorm in a "humiliating manner." (*Id.*)

Plaintiff also claims that when he reached the entrance of the dorm, his face was pushed against the wall, he was punched in the left ribs and the back, and his face was "squeezed" while Sergeant Hammond allegedly threatened him, "smacked" plaintiff in the back of the head and "threw" him into the back of the van to drive to SHU.  (AC ¶ 11).  Plaintiff claims that when they arrived at SHU, he was "snatched by the throat and neck" by defendant Brassard and pushed up against the wall by his ribs and the back of his head.  (*Id.*)  Finally, plaintiff alleges that the strip search was performed in a "sexually" humiliating manner, because the officer made plaintiff spread his buttocks so that he "felt" molested.[33]  (AC ¶ 12).

The defendants allege that plaintiff was transferred to SHU on July 1, 2008, without incident and without injury.  They also allege that the routine strip search was

---

[33] Even if plaintiff had exhausted his strip frisk claim, he alleges that the officers made fun of him, threatened him, and looked at him for an extended period of time, asking him to spread his buttocks, and making other demeaning comments. (AC ¶ 12).  While allegations of sexual abuse may, in some circumstances, violate the Eighth Amendment, isolated incidents of harassment, involving verbal harassment and even touching are not severe enough to be "objectively, sufficiently serious." *Boddie, v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997).

required for admission to SHU and was conducted in the proper manner. *See* DOCCS Directive No. 4910(IV)(D)(1) (inmates are to be strip frisk upon entry to SHU). The only defendants allegedly involved in this use of force were Hammond, Brassard, and Reardon.

In the amended complaint, plaintiff now claims that he complained about the injury to the left side of his rib cage, and that the "bone was protruding out of the skin." (AC ¶ 13). However, in his grievance, dated July 6, 2008, he stated that he "was hit in the ribs and in the back of the head *not to cause injury, or to have injury shown on my body*, but hit and slapped to be humiliated with malice and disrespect tying to provoke me to strike back, but I held myself and refused to be tricked into catching an assault on an officer." (Dkt. No. 74-21 at 29) (emphasis added). Plaintiff wrote this document *five days* after the incident. If plaintiff's rib had been protruding from his skin on July 1, it is hard to believe that plaintiff would have written this grievance without complaining about an obviously broken rib.

The plaintiff's medical records also belie his assertion of a broken rib. On July 7, 2008, plaintiff was examined in SHU. (Dkt. No. 75 at 2). He was viewed in shorts. There were no marks, bruises or opened or reddened areas. Plaintiff denied injury. (*Id.*) Plaintiff was examined again prior to his transfer to Upstate on July 15, 2008. (*Id.* at 3). Even assuming that he was not properly examined at Franklin,[34] plaintiff

---

[34] One of plaintiff's claims was that he was denied adequate medical treatment by a John Doe defendant "after the assault sustain[ed] from defendants Sgt. [Hammond], and C.O. [Brassard] and Reardon . . . ." (AC ¶ 16(D)). No medical John Doe defendant was ever identified or served. However, it is clear that plaintiff had no injuries either when he left Franklin or when he arrived at Upstate. Any medical care claim would also be subject to dismissal.

was examined upon his admission to Upstate Correctional Facility on July 16, 2008. (*Id.* at 4). Plaintiff denied any "current" medical complaints at that time. (*Id.*)

By the time that plaintiff appealed the denial of his grievance on August 24, 2008, plaintiff left out the statement, admitting that he had no injury and instead claimed that he was hit in the ribs twice. (Dkt. No. 74-21 at 8). He was allegedly punched on the left side of his rib cage before he was taken to SHU and punched on the right side of his rib case after he arrived at SHU. (*Id.*)

Plaintiff's own *contemporaneous* statements and his medical records show that whatever force was used did not cause any injury. Although the lack of injury is not fatal to an excessive force claim, the extent and nature of an injury, if any, "'is probative of the amount and type of force actually used . . . and that in turn is likely to reflect on the reasonableness of that force[.]'" *Cunningham v. McCluskey*, No. 05 Civ. 10169, 2011 WL 2791336, at *7 (S.D.N.Y. June 22, 2011) (quoting *Yang Feng Zhao v. City of New York*, 656 F. Supp. 2d 375, 390 (S.D.N.Y. 2009); *Washington v. Parr*, 561 F. Supp. 2d 394, 407 (S.D.N.Y. 2008) (finding de minimus injury to be probative of de minimus force)), *report-recommendation adopted by* 2011 WL 3478312 (S.D.N.Y. Aug. 8, 2011). Defendants dispute that any force was used at all. (Dkt. No. 74-21; Def.s' Ex. R at 19-20, 24, 25 (Memoranda by Hammond, Brassard, and Gray, Responding to Grievance)).

As a general rule, at the summary judgment stage, courts must not weigh evidence or assess the credibility of witnesses. *Scott v. Coughlin*, 344 F.3d 282, 290-91 (2d Cir. 2003). However, in the "rare circumstances where plaintiff relies almost

exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for plaintiff, and thus whether there are any genuine issues of material fact, without making some assessment of the plaintiff's account." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). *See also Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987) (conclusory allegations are insufficient to state a claim for relief under section 1983); *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case").

In this case, it is not simply plaintiff's word against the officers. Most of the statements in plaintiff's amended complaint describing this incident would not rise to the level of constitutional violations, except for the punch to plaintiff's ribs. Plaintiff filed a grievance five days after the incident and specifically stated that he was not injured, but the defendants treated him roughly in order to "humiliate" him. Plaintiff never mentioned the alleged use of force during his disciplinary hearing, although it is clear that he was alleging some sort of retaliation by the officers. In his amended complaint, filed approximately one year after the incident, plaintiff now claims that his rib was sticking out of his skin. The medical reports at both Franklin and Upstate, a facility that has nothing to do with the incident and to which plaintiff was transferred a week after the incident, indicate that plaintiff claimed no injuries. At worst, plaintiff claims that defendants swore at him and he was treated roughly while being handcuffed and escorted to SHU. Plaintiff has not responded or opposed the

defendants' motion for summary judgment, thus, this court finds that there are no genuine issues of material fact, and defendants's motion for summary judgment may be granted on plaintiff's claim of excessive force.

WHEREFORE, based on the findings above, it is

RECOMMENDED, that plaintiff's motion for summary judgment (Dkt. No. 71) be DENIED, and it is

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 74) be GRANTED and the amended complaint be DISMISSED IN ITS ENTIRETY AS TO ALL DEFENDANTS.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: October 11, 2012

Hon. Andrew T. Baxter
U.S. Magistrate Judge